FILED
APR 16 2019
Clerk, U S District Court
District Of Montana
Billings

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>GREGORY PAUL GREEN and<br>BRITTANY NICOLE GREEN,<br><br>Defendants. | CR 19-05-BLG-SPW-02<br><br>ORDER AND OPINION |

Before the Court is Defendant Brittany Nicole Green's motion to suppress evidence. (Doc. 43). The parties urged the Court to determine this motion without holding an evidentiary hearing because the parties did not dispute any issues of material fact. Accordingly, the Court opted to forego an evidentiary hearing. *See United States v. Walczak*, 783 F.2d 852, 856 (9th Cir. 1986) (the district court is not required to hold an evidentiary hearing on a motion to suppress when no controverted facts were at issue regarding the validity of the search). Having read and reviewed the parties' submissions and the applicable law, this Court now DENIES Brittany Green's motion.

I.  **Facts**

On December 18, 2018, a truck carrying mail from Canada to the United States entered Port Huron, Michigan. (Doc. 44-1 at 5). During a Customs and

1

Border Patrol narcotics examination, law enforcement discovered a package labeled "Organic Fitness Vitamin" originating out of Ontario, Canada, and addressed to Gregory Green at Westwood Drive, in Billings, Montana. (*Id.*). Inside, law enforcement discovered a second vacuum-sealed package containing Xanax, a Schedule VI controlled substance. Officers turned the package over to a Homeland Security Investigator who concluded that the parcel contained 1,471 pills. Homeland Security seized the pills and sent them, along with the original packaging, to the Billings Task Force for further investigation. (*Id.*).

After the package arrived in Billings, Task Force agents contacted the United States Postal Inspector for Montana, Walt Tubbs. Tubbs advised the agents that 112 packages had been shipped to the same address between December 20, 2017 and December 20, 2018. Tubbs agreed to assist in making a controlled delivery at a later date. (*Id.*). Agents found a Gregory P. Green listed at the same address listed on the package. Gregory Green's criminal history check revealed he had arrests for arson, theft and disorderly conduct some twenty years prior. (*Id.* at 6).

After including this information in an application for a search warrant, on January 2, 2019, Officer Michael Robinson sought and was granted an anticipatory search warrant for Green's house from Thirteenth Judicial District Judge Donald

Harris. The anticipatory warrant was contingent on a package containing 50 Xanax pills being delivered and accepted into the residence. (Doc. 44-2).

On January 3, 2019, officers conducted surveillance on Gregory Green's house and saw an older female leave the house and go to the mailbox. Shortly thereafter, the postal inspector delivered the package to the house. The older female answered the door, took the package and brought it inside. After this, agents knocked on the door to execute the search warrant. The female answered the door and the agents entered the house. (Doc. 44-1 at 6).

In addition to the female that had answered the door, agents located Gregory Green in an upstairs office, and Gregory's adult daughter, Brittany Green, in a downstairs bedroom. All three individuals were taken outside to be identified and questioned. Both Greens were arrested and taken into custody. The female told agents that she had met Gregory Green approximately twenty years ago and that they were in a loving but not intimate relationship. She told agents that she and Gregory had moved to the house in June 2017, and that Gregory managed her social security account and handled the bills. She did not know what he did for a living. She told the agents that Brittany had moved in a while ago and stayed in the basement. (*Id.* at 6-7).

When agents asked the female about the packages coming to the house, she could not provide any information. She denied knowing about any drug use or

3

distribution from the home. Law enforcement took her to another location while the house was searched. (*Id.* at 7).

While conducting a safety sweep and clearing the basement, the agents saw that the living room and adjacent bedroom were "littered with drugs and drug paraphernalia" including what agents "originally believed to be a clandestine methamphetamine lab." (*Id.*). Agents contacted the Billings Fire Department and Hazardous Materials team who assisted in determining if the basement posed a safety risk. Although the team determined the house was safe to enter, agents were advised to complete the search warrant with proper personnel protection equipment. (*Id.*).

During the search, agents noticed that the computer in Gregory Green's room displayed the "dark web" and showed a screen indicating that he was selling Xanax to people across the country. Agents also located a sealed package that appeared ready to mail in Gregory Green's office. Inside, the package was a plastic wrapped box containing a sealed baggie. In the sealed baggie was approximately seven grams of suspected methamphetamine and two Xanax bars. Further search of the office turned up approximately 100 grams of suspected methamphetamine and several thousand Xanax bars. (*Id.*).

In the basement, agents discovered approximately 122 grams of suspected methamphetamine, ketamine, carfentanil and other controlled drugs. A sample of

the suspected methamphetamine was tested and registered positive for methamphetamine. Agents also found hundreds of feet of glass tubing for glass pipes, a 100-pound butane tank and instructions for Brittany Green on how to combine drugs for distribution. Throughout the rest of the house, Agents located hundreds of items of drug paraphernalia. Agents also found large amounts of packing material for sending items through the mail.

As agents were searching the residence, a United States Postal Service mailman delivered four packages and two letters to the Greens' mailbox. Sergeant Jagers removed three packages from the mailbox that were similar in size, shape, and color to the package seized in Michigan. The packages were from the same sender and Canadian address. The mailbox also contained a priority 2-day package from Portland, Oregon, an envelope from the Netherlands, and an envelope from India. All the mail was addressed to Gregory Green. Officers seized the mail pending an application for a search warrant. (*Id.* at 8-9).

On January 9, 2019, Agent Robinson applied for, and was granted, a search warrant for the mail seized. (Doc. 44-3 at 17). Robinson discovered more Xanax pills in the three packages from Canada, bringing the total number of pills up to approximately 4,500. The Portland package contained 16 grams of an unknown tan substance concealed within several layers of packaging. The letter from India contained a package labeled "phenobarbitone tablets" concealed in several layers

5

of packaging. The Netherlands letter contained a tin foil package with an unknown substance. Believing all the substances to be controlled, agents sent them to the DEA laboratory for analysis. (Doc. 52 at 7; Doc. 44-3 at 18).

On January 9, 2019, Agent Robinson applied for, and was granted, a second warrant to search the Green residence, this time from United States Magistrate Judge Cavan. (Doc. 44-4). Brittany Green moves to suppress the evidence obtained from all three search warrants.

## II. Discussion

Brittany makes three arguments in support of suppression: (1) the January 2, 2019, warrant was overbroad and authorized an unreasonable search; (2) the January 2, 2019, warrant lacked probable cause; and (3) the search of the mailbox at the residence was unlawful, so the subsequent searches based on this evidence were fruit of the poisonous tree. (Doc. 44 at 7-9).

### 1. January 2, 2019, Warrant

#### A. The January 2, 2019, warrant was not overbroad.

The Fourth Amendment prohibits the issuance of a warrant except one "particularly describing the place to be searched and the persons or things to be seized." This requirement is intended to limit authorization to "specific areas and things for which there is probable cause to search." *Maryland v. Garrison*, 480 U.S. 79, 84 (1987).

Relying on the Fourth Circuit case, *United States v. Lyles,* 910 F.3d 787, 790 (4th Cir. 2018), Brittany argues that the January 2, 2019, warrant in this case is overbroad because it lacks factual support evidencing drug distribution from the Green residence. (Doc. 42 at 5). In *Lyles*, officers conducted a trash search and discovered discarded marijuana stems and rolling papers. *Id.* Using only this information, officers obtained a search warrant for the home alleging suspected "possession of controlled substances, possession with intent to distribute controlled substances, and money laundering." *Id.* at 791. The district court authorized a search warrant for items related to drug distribution including safes, computers, telephones, financial records, memory sticks, etc. *Id.* The Fourth Circuit found that the warrant violated the reasonable search requirement because a broad, general warrant for items relevant to drug distribution was not supported by the facts in the affidavit, which only demonstrated the crime of drug possession. *Id.* at 796.

The Court finds that *Lyle* is distinguishable from the case at hand. Unlike in *Lyle,* the warrant before this Court contains factual support for the crime of drug distribution. First, unlike the officers in *Lyle* who found a very small amount of drugs and paraphernalia - three marijuana stems and three empty packs of rolling papers - in the trash, *id.* at 790, officers here seized almost 1,500 Xanax pills

7

addressed to the residence to be searched. (Doc. 44-1 at 5). The sheer number of pills evidences potential drug distribution.

Second, unlike the officers in *Lyle* who could not verify whether the marijuana and papers came from the Lyle residence, here the package containing the large number of illegal pills that officers intercepted was addressed to the house at issue in the search warrant, and to a resident of the house, Gregory Green. (*Id.*).

Third, in *Lyle*, nothing indicated Lyle repeatedly threw out marijuana and rolling papers. This was apparently the first time that officers had discovered marijuana or rolling papers in the residence's trash. In contrast, officers here learned that over 112 packages had been delivered to the same house and the same recipient within the last year. (*Id.*). Considering law enforcement had discovered almost 1,500 Xanax pills in just one package, these facts contribute to the fair probability that evidence of the crime of distribution would be found in the Green residence.

Brittany argues that Robinson failed to provide any "data" related to the amount of Xanax used by a single person, insinuating that 1,500 pills could be for one person and thus not evidence of drug distribution. In making this argument, however, she asks the Court to ignore the fact that law enforcement knew 112 packages had been sent to the house in one year and ignore the fair probability at least some of those packages likely contained a similar number of illegal pills. The

Court finds that the number of pills and the number of deliveries to the Gregory Green residence provided a fair probability that evidence of the crime of drug distribution would be discovered in the residence. Accordingly, the Court finds that the search warrant authorizing search for items commonly associated with drug distribution was not overbroad. *See United States v. Ayers*, 924 F.2d 1468, 1479 (9th Cir. 1999) ("in the case of drug dealers, evidence is likely to be found where the dealers live.").

### B. The January 2, 2019 warrant was supported by probable cause

Brittany argues that Officer Robinson's sworn application for a search warrant asserted no factual basis of criminal behavior beyond the single package of Xanax that was the basis of the anticipatory search warrant issued on January 2, 2019. She argues that because Robinson provided an erroneous date for the package delivery, the anticipatory search warrant lacked probable cause. The Court disagrees.

In the context of anticipatory search warrants, the issuing judge must "determine, based on the information presented in the warrant application, that there is probable cause to believe the [contraband] items to be seized will be at the designated place when the search is to take place." *United States v. Vesikuru*, 314 F.3d 1116, 1122 (9th Cir. 2002).

In this case, the anticipatory warrant was supported by probable cause. The supporting affidavit indicated that law enforcement had intercepted a package containing nearly 1,500 pills believed to be Xanax, and that this package was addressed and en route to the Green residence when it was seized. The affidavit also provided that no search of the Green residence would commence until the altered package had first been accepted and taken into the residence.

The conditions precedent to the search guaranteed that the package was on a "sure course" to the Green residence. *United States v. Ruddell*, 71 F.3d 331, 333 (9th Cir.1995) ("An affidavit in support of an anticipatory search warrant must show that the property sought is on a sure course to the destination targeted for the search."); *cf. United States v. Hendricks*, 743 F.2d 653, 655 (9th Cir. 1984) (holding anticipatory search warrant was not supported by probable cause where the contraband was not on a sure course to the residence searched), cert. denied, 470 U.S. 1006 (1985). These conditions precedent also ensured a sufficient nexus between the contraband found in Michigan and the Green residence. *See United States v. Rodriguez*, 869 F.2d 479, 484 (9th Cir.1989) (holding that the issuing judge must find a "reasonable nexus" between the contraband sought and the residence). District Judge Harris had a substantial basis for concluding that, once the package was accepted and taken into the residence, evidence relating to drug

trafficking could be found therein. Thus, the warrant was supported by probable cause.

The Court is not persuaded by Green's argument that the typographical error in the affidavit erroneously identifying the delivery date for the package as December 3, 2019, rather than January 3, 2019, destroyed probable cause for the warrant. (Doc. 44 at 10). Considering the plan outlined in the warrant, in conjunction with the other dates listed in the application, the Court finds that any reasonable judge reading the affidavit would have understood that the discovery of the package in Michigan - the basis for the requested mail delivery and anticipatory search warrant - occurred in December 2018, and the request for the anticipatory warrant would follow on the heels of that discovery because law enforcement could set up a controlled delivery. It would not be reasonable for an officer to apply for an anticipatory search warrant almost a year in advance considering both the offense and the evidence at issue.

As discussed above, the additional facts provided in the affidavit demonstrated a "reasonable nexus," *United States v. Chavez–Miranda*, 306 F.3d 973, 978 (9th Cir. 2002) (internal quotation marks omitted), between the evidence discovered during the customs search and the search of the Greens' residence. As noted above, the nearly 1,500 Xanax pills found in the package addressed to Gregory Green at the residence listed in the search warrant, combined with the fact

11

that 112 packages had been delivered that year, created a "fair probability," sufficient to justify a warrant, that further evidence related to drug distribution would be found in his home. *See United States v. Hill*, 459 F.3d 966, 970 (9th Cir. 2006).

### C. The Good Faith Exception applies in any case

Even where a warrant is unsupported by probable cause, evidence obtained from the warrant's execution otherwise subject to suppression, *Weeks v. United States*, 232 U.S. 383 (1914), is subject to a "good faith" exception where an officer acted "in objectively reasonable reliance" on the warrant. *United States v. Leon*, 468 U.S. 897 (1984). There are exceptions to the exception: where the affiant misled the magistrate, where the magistrate abandoned his or her judicial role, where the affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," and where the warrant is so vague as to be facially deficient. *Id.* at 922-23. "To determine whether the officer acted in objectively reasonable reliance, 'all of the circumstances-including whether the warrant application had previously been rejected by a different magistrate-may be considered.'" *United States v. Underwood*, 725 F.3d 1076, 1085 (9th Cir.2013) (citing *Leon*, 468 U.S. at 922 n. 23). Brittany Green argues that Judge Harris essentially "rubber stamped" the search warrant and abandoned his judicial role. (Doc. 59 at 5).

The Court disagrees. First, in making this argument, Brittany faces a "high" "threshold." *Messerschmidt v. Millender*, 565 U.S. 535 (2012) (holding officers were entitled to qualified immunity in a § 1983 suit, because their reliance on the warrant that was at the heart of the suit was not objectively unreasonable). An officer's reliance on a warrant cannot be said to be unreasonable where "any arguable defect would have become apparent only upon a close parsing of the warrant application." *Messerschmidt*, 565 U.S. at 556; *Leon*, 468 U.S. at 921 ("In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient."). The Court has explained that "[i]t is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment," because "the magistrate is more qualified than the police officer to make a probable cause determination." *Messerschmidt*, 565 U.S. at 546-47 (quoting *Leon*, 468 U.S. at 921).

Second, in his affidavit, Robinson noted that the package was intercepted on December 18, 2018. (Doc. 44-1 at 5). The application details a plan to deliver the package "early in the morning," and the affidavit was presented to Judge Harris on January 2, 2019 at 4:29 p.m. (*Id.*) The December 3, 2019, date was obviously a typographical error as evidenced by the fact that the warrant was in fact served on

13

January 3, 2019. Based on the totality of the circumstances, it would not have been obvious to a reasonable officer that the facts contained in the affidavit setting forth the facts above did not establish probable cause to believe Green was involved in drug distribution activity.

2. **Mailbox Search and Seizure**

    a. **Brittany lacks standing to assert a constitutional violation.**

Brittany seeks to exclude packages addressed to Gregory Green and seized from their residential mailbox by law enforcement by arguing that her Fourth Amendment right against an illegal search was violated when law enforcement opened the mailbox. But in *Jones v. United States*, 362 U.S. 257, 261 (1960), the Supreme Court held that "in order to qualify as a 'person aggrieved by an unlawful search and seizure' one must have been a victim of a search or seizure, one against whom the search was directed, as distinguished from one who claims prejudice only through the use of the evidence gathered as a consequence of a search or seizure directed at someone else."

The Court reiterated this rule in *Alderman v. United States*, 394 U.S. 165, 173 (1969), stating that Fourth Amendment rights are personal rights which cannot be vicariously asserted. *See also Rakas v. Illinois*, 439 U.S. 128, 134 (1978). Specifically, the Court held that, "no rights of the victim of an illegal search are at stake when the evidence is offered against some other party." *Id.* at 174.

Applying that rule here, even if law enforcement's search of the mailbox was illegal as to Brittany, she is not "the victim" of the search. Law enforcement did not seize anything that belonged to or was private to her. The evidence gathered as a consequence of the search of the mailbox is directed at Gregory Green; the packages were his. Accordingly, the Court finds that Brittany does not "qualify as a person aggrieved by an unlawful search and seizure" and lacks standing to assert any constitutional violation. *Jones*, 362 U.S. at 261; *Alderman*, 394 U.S. at 173.

### b. Brittany did not have a reasonable expectation of privacy in the residence's unsecured, outdoor mailbox.

Even assuming Brittany had standing, however, she does not have an expectation of privacy in the mailbox. Brittany argues that law enforcement conducted an illegal search when they opened her mailbox to see the packages inside. (Doc. 44 at 13). Although she acknowledges that the Ninth Circuit has upheld a warrantless search and seizure of mail from a locked parcel box in a postal facility, *United States v. Hinton*, 222 F.3d 664 (9th Cir. 2000), she simply seems to disagree with the holding. More importantly, she provides no legal support for her argument that a reasonable expectation of privacy exists in an unlocked residential mailbox like the one at issue here.

Most jurisdictions that have considered this question, including the one binding upon this Court, have held that a person has no reasonable expectation of

privacy in an unlocked accessible mailbox. *United States v. Stokes*, 829 F.3d 47 (1st Cir. 2016); *Hinton*, 222 F.3d 664 (9th Cir. 2000); *United States v. Osunegbu*, 822 F.2d 472 (5th Cir. 1987); *United States v. Lewis*, 738 F.2d 916 (8th Cir. 1984); *State v. Champion*, 594 N.W.2d 526 (Minn. Ct. App. 1999); *Gabriel v. State*, 290 S.W.3d 426 (Tex. Ct. App. 2009); *see Parker v. State*, 112 So.2d 493 (Ala. Ct. App. 1959).

In *Hinton*, 222 F.3d at 667, the Ninth Circuit considered whether an individual has an expectation of privacy in a parcel locker. There, the appellant rented a post office box, which was closed and locked from the public side but open on the postal employees' side. *Id.* When the appellant received a package that was too large for his post office box, postal employees placed the package in a parcel locker and placed a key for the locker in his post office box. *Id.* The parcel locker was locked to the public, but a door at the back of the locker provided a keyless entry for employees. *Id.* So, although the public could not access the locker, postal employees could remove packages from their side without using a key. *Id.* at 667-68.

The Ninth Circuit held that there "is no reasonable expectation of privacy in a parcel locker." *Id.* at 675. The court reasoned that since the contents could be accessed by postal workers, "one may not claim an objectively reasonable expectation of privacy in a parcel locker." *Id.* The court explained that "[t]he

postal employees would have the right to move the packages whether the parcel locker has a back door facing the employee area or not, because the right to move the packages exists irrespective of a locker's enclosure." *Id.* at 676. In other words, the decision turned primarily on the postal workers' unlimited access to the packages.

The Eight Circuit seems to have come to the same conclusion for the same reason. In *Lewis*, 738 F.2d at 918-19 & n.2, the Eighth Circuit considered whether the appellant had a legitimate expectation of privacy in his unlocked mailbox that was accessible to the public after police had opened the mailbox without a warrant. After receiving a report that a credit card was being used fraudulently, police discovered that some of the merchandise being purchased with the credit card was being delivered to a particular address and mailbox. Law enforcement drove to the address and found a mailbox mounted in a two-gallon can filled with concrete, lying on the ground in a ditch. Law enforcement looked in and saw specific inculpatory letters. *Id.* at 918, 921. Law enforcement also later observed appellant repairing the mailbox. *Id.*

After his arrest, appellant "moved to suppress the evidence concerning the warrantless opening of the [] mailbox, additionally claiming that all subsequent search warrants, and therefore all evidence at trial, were fruit of this allegedly illegal search." *Id.* at 919. The Eighth Circuit "ha[d] no difficulty in concluding

that [appellant] lacked a legitimate expectation of privacy in the mailbox[,]" because "[h]e had every expectation that governmental officials would regularly open the box to deliver mail." *Id.* at 919 n.2. The Fifth Circuit is in accord. *See also Osunegbu*, 822 F.2d at 474 (upholding a warrantless search of a private post office box by postal inspectors because postal employees would have to look at and move mail so there is a minimal expectation of privacy as to the contents of a mailbox).

In *Stokes*, 829 F.3d at 52, the First Circuit considered "whether a defendant can hold a reasonable expectation of privacy in a rented mailbox[.]" From 2008 to 2012, appellant sent fraudulent invoices to thousands of businesses. Each invoice appeared to be sent by a legitimate trade association and directed the business to send membership dues to one of three addresses in Massachusetts where, unbeknownst to the business, Stokes received mail. Postal inspectors intercepted mailings to these addresses. The First Circuit affirmed the district court's denial of Stokes motion to suppress, holding that Stokes did not have "a legitimate expectation of privacy in the ... P.O. Box." *Id.* at 52. *See also Osunegbu*, 822 F.2d at 474 (upholding a warrantless search of a private post office box by postal inspectors because postal employees would have to look at and move mail so there is a minimal expectation of privacy as to the contents of a mailbox).

Although the current matter involves a mailbox at a residence and not a post office box nor a parcel locker inside a post office, it is undisputed that postal workers have the same access to mail destined for individual's post office boxes as they do to mail destined for residential mailboxes. Further, Brittany has not provided any facts demonstrating that she endeavored to make her mailbox private, by installing a locked mailbox for example. Therefore, following the Ninth Circuit's logic in *Hinton,* as well as the First, Eighth and Fifth Circuits, this Court finds that Brittany did not have an expectation of privacy in the mailbox at issue.

### 3. Delay in Searching the Packages

Brittany argues that the lapse in time from when law enforcement seized the packages to when they were searched was unreasonable and therefore unconstitutional. (Doc. 44 at 14). As the Court explained above, however, Fourth Amendment rights are personal rights which cannot be vicariously asserted. *Alderman,* 394 U.S. 165 at 173.

Here, law enforcement seized packages addressed to Gregory Green and sent by individuals from out of state, none of whom were Brittany. (*See* Doc. 44-2 at 1-4). Accordingly, Brittany has not proven that she has any standing to complain about law enforcement's seizure of the packages or whether that seizure was unreasonable due to delay. *Id.*; *Jones,* 362 U.S. at 261.

/

## III. Conclusion

For the reasons discussed above, Brittany Green's Motion to Suppress (Doc. 43) is DENIED.

DATED this 15th day of April 2019.

*Susan P. Watters*
SUSAN P. WATTERS
United States District Judge